**LAW OFFICE OF ROBERT M. GREGORY, P.C.**
Robert M. Gregory, Bar No. 021805
1930 S. Alma School Road, Suite A-115
Mesa, Arizona 85210
Telephone: (480) 839-4711
Facsimile: (480) 452-1753
Robert.gregory@azbar.org

*Attorney for Plaintiff Larry Rohr*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| LARRY ROHR, an individual,<br><br>    Plaintiff,<br><br>vs.<br><br>SALT RIVER PROJECT AGRICULTURAL IMPROVEMENT AND POWER DISTRICT, a political subdivision of the State of Arizona,<br><br>    Defendant. | Case No. CV-04-3015-PHX-FJM<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT WITH MEMORANDUM OF POINTS IN SUPPORT THEREOF**<br><br>(Honorable Frederick J. Martone) |

**COMES NOW** the Plaintiff, Larry Rohr (hereinafter, "Plaintiff"), by and through his undersigned counsel, pursuant to Fed. R. Civ. P. Rule 56, and submits this Response to Defendant Salt River Project Agricultural Improvement and Power District's (hereinafter "Defendant" or "SRP") Motion for Summary Judgment. Plaintiff's Response is supported by the accompanying (1) Memorandum of Points and Authorities, included herewith, (2) Plaintiff's Separate Statement of Facts ("SOF") in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment, together with all exhibits attached thereto, and (3) the record developed in this matter, all of which are incorporated herein by this reference.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.     FACTUAL BACKGROUND

Plaintiff was employed by Defendant as a welding metallurgy specialist, which employment began on or about May 1981. (Plaintiff's Separate Statement of Facts ["SOF"] ¶ 1). Beginning in 1990, Plaintiff worked as part of the Plant Technical Support Group, and reported directly to Greg Merkel ("Merkel").  (SOF ¶ 2.)  Merkel testified that Plaintiff's primary work duties were "tak[ing] care of welding procedures, procedure qualification records, updating the welders' files, [and] recommend[ing] welding rod for different types of welding applications." (SOF ¶ 3.)  The essential functions of Plaintiff's work duties were defined in a functional capacity assessment performed by Defendant in 1992.  (SOF ¶ 4.)

Plaintiff was diagnosed with diabetes on or about 2000.  (SOF ¶ 5.) On or about August 11, 2003, Plaintiff first reported to Merkel that he had diabetes, and requested in writing that Defendant observe three specific restrictions for future assignments, as follows:  a) avoid exhaustion and overheating; b) avoid exposure to hazards; and c) avoid overnight, out-of-town travel.  (SOF ¶ 6.)  On or about August 27, 2003, Plaintiff's primary care provider, Stephen E. Dippe, M.D. ("Dr. Dippe"), issued a written order to Defendant in which he directed that Plaintiff not be given overnight out-of-town assignments and that Plaintiff not become over exhausted as a result of working more than 9 hours a day or being exposed to extreme heat. (SOF ¶ 7.)

On September 4, 2003, at Merkel's request, Plaintiff met with Timothy Woehl, M.D. ("Dr. Woehl") of Defendant's Health Services Department, who indicated in his report to

Merkel several "permanent accommodations" to be made for Plaintiff, including: no shift work, workday of 9 hours or less, limitation on thermal stress, no heavy exertional activities, no working from unprotected heights, no unprotected climbing, and the requirement to carry an immediate sugar source. (SOF ¶ 8.) Merkel testified that, with the exception of the requirement to carry an immediate sugar source, all of the permanent accommodations indicated by Dr. Woehl comprised essential job functions for Plaintiff's job position. (SOF ¶ 9.)

Merkel testified that Plaintiff could only perform 10% of his job duties as a result of the permanent accommodations indicated by Dr. Woehl. (SOF ¶ 10.) On or about February 1, 2004, at the request of Defendant's Health Services Department, Merkel prepared a new functional assessment for Plaintiff, in which he described what Plaintiff's job duties were and how much time should be allocated across six functional areas (SOF ¶ 11), which he listed as duties that Plaintiff "should be doing" as opposed to duties he was actually doing. (SOF ¶ 12.) Merkel testified that he did not utilize the job description for Plaintiff's job position in creating the percentages he allocated in the new functional assessment, but rather relied on what the needs of the group were. (SOF ¶ 13.) Merkel testified that since Defendant first performed a functional assessment for the welding metallurgy specialist position in 1992, Defendant did not prepare another functional assessment for that position until February 1, 2004, when he was asked to do so by Defendant's Health Services Department (SOF ¶ 14.)

At Merkel's request, Plaintiff met again with Dr. Woehl on February 19, 2004, to determine if there had been a change in Plaintiff's medical condition that would affect the restrictions and address Plaintiff's availability to work on short notice and Plaintiff's sick time absences. (SOF ¶ 15.) Dr. Woehl sent a letter to Merkel dated February 19, 2004, in which he

3

wrote that his "recommendation for permanent restrictions remains unchanged from those as previous[ly] outlined to you" and that "[i]t remains my opinion that Mr. Rohr is physically able to perform the essential functions of his job **with** the accommodations as outlined." (SOF ¶ 16, emphasis added.) However, Merkel testified that Plaintiff could not perform the essential functions of his job with the accommodations outlined by Dr. Woehl. (SOF ¶ 17.)

Merkel testified that only two of the six accommodations listed by Dr. Woehl – working under thermal stress and working from unprotected heights/no unprotected climbing – prevented Plaintiff from performing his essential job functions (SOF ¶ 18), which two accommodations were, in fact, not essential functions of the job but rather environmental working conditions. (SOF ¶ 19.) The Functional Assessment defining Plaintiff's essential work functions and environmental working conditions identified "unprotected heights" not as an essential work function but as an environmental working condition that was "never" required (SOF ¶ 20), and "temperature – heat" not as a work function but as an environmental working condition. (SOF ¶ 21.)

On or about March 16, 2004, Merkel, Dave Shoaf (Merkel's supervisor), and Earline Foster, from Defendant's human resource department, met with Plaintiff and "informed him that based upon his permanent medical restrictions, he could no longer perform the essential functions of his job", and gave him three options concerning his future employment with Defendant, as follows: find a new position, go on disability leave, or retire. (SOF ¶ 22.) After March 16, 2004, Plaintiff attempted to find a new position within SRP but was unable to do so. (SOF ¶ 23.) On or about May 25, 2004, Defendant determined that, with the restrictions

4

imposed by Dr. Woehl, Plaintiff could only do "a maximum of 17.5 % of the work that we need [Mr. Rohr] to do." (SOF ¶ 24.)

On or about May 26, 2005, Plaintiff made a formal complaint to Defendant in which he alleged discrimination by Defendant on the basis of his disability. (SOF ¶ 25.) Effective June 15, 2004, Plaintiff was placed on a medical leave of absence, which leave would end and Plaintiff would be administratively terminated unless: a) he was released by a physician to return to work on or before June 15, 2005, or b) he obtained another job within SRP if he returned after December 15, 2004. (SOF ¶ 26.) On or about June 16, 2004, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission, Charge No. 350-2004-03723, in which he alleged discrimination on the basis of his age and disability. (SOF ¶ 27.)

On or about July 29, 2004, Plaintiff applied for long-term disability ("LTD") benefits through Defendant's LTD carrier, UnumProvident, but Plaintiff's application was denied. (SOF ¶ 28.) Plaintiff appealed the denial of his application for LTD benefits, which resulted in a reversal of the previous denial of his application. (SOF ¶ 29.)

Defendant has adopted policies and procedures for employees who have or claim to have disabilities, including factors which are considered in determining a job's essential job functions and what actions by Defendant constitute a reasonable accommodation. (SOF ¶ 30.)

## II.    ARGUMENT

A. **Standard of Review**

Summary judgment is proper if the materials before the district court "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).   In considering a motion for summary judgment, the court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether any genuine issues of material fact exist.  *Cordova v. State Farm Ins.*, 124 F.3d 1145, 1146 (9th Cir. 1997).  At the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n.,* 809 F.2d 626, 630-31 (9th Cir. 1987).  If the moving party meets the requirements of Rule 56 by showing an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

III. **PLAINTIFF CAN ESTABLISH A PRIMA FACIE CASE OF DISABILITY DISCRIMINATION**

To establish a prima facie case under the Americans with Disabilities Act ("ADA") that Defendant failed to accommodate his disability, Plaintiff must demonstrate that: (1) he is disabled within the meaning of the ADA; (2) he is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) he suffered an adverse employment action because of his disability. *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999).

### A.  **Plaintiff is Disabled Under the ADA**

Regarding the first element of a prima facie case, the ADA defines the term "disability" with respect to an individual as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual. . . ."  42 U.S.C. § 12102(2)(A).  The Ninth Circuit has previously described "major life activities" as including "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Fraser v. Goodale,* 342 F.3d 1032, 1038 (9th Cir. 2003); *Thornton v. McClatchy Newspapers, Inc.,* 261 F.3d 789, 794 (9th Cir. 2001) ("working"); *Vinson v. Thomas,* 288 F.3d 1145, 1153 (9th Cir. 2002), *cert. denied,* 537 U.S. 1104, 123 S.Ct. 962, 154 L.Ed.2d 772 (2003) ("learning").  In *Fraser v. Goodale,* the Ninth Circuit held that diabetes was a physical impairment under the ADA, and eating was a major life activity. 342 F.3d at 1040.

Federal regulations list three factors to be considered in determining whether an individual is substantially limited in a major life activity; "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2 (j) (2).

Plaintiff was diagnosed with diabetes on or about 2000.  (SOF ¶ 5.)  Plaintiff was able to keep his diabetes in check for the next several years, such that he did not need to inform his employer or request any accommodations.  However, due to progression of the disease, on or about August 11, 2003, Plaintiff first reported to Merkel that he had diabetes, and requested in writing that Defendant observe three specific, self-imposed restrictions for future assignments, as follows:  a) avoid exhaustion and overheating; b) avoid exposure to hazards; and c) avoid

overnight, out-of-town travel. (SOF ¶ 6.) In response to Defendant's request that Plaintiff secure an order from his physician directing that such accommodations be made, Plaintiff's primary care provider, Stephen E. Dippe, M.D., issued a written order to Defendant in which he directed that Plaintiff not be given overnight out-of-town assignments and that Plaintiff not become over exhausted as a result of working more than 9 hours a day or being exposed to extreme heat. (SOF ¶ 7.) On September 4, 2003, at Merkel's request, Plaintiff met with Timothy Woehl, M.D. of Defendant's Health Services Department, who indicated in his report to Merkel several "permanent accommodations" to be made for Plaintiff, including: no shift work, workday of 9 hours or less, limitation on thermal stress, no heavy exertional activities, no working from unprotected heights, no unprotected climbing, and the requirement to carry an immediate sugar source. (SOF ¶ 8.)

The nature and severity of Plaintiff's condition is best captured in Plaintiff's own words from the discrimination complaint he submitted to Defendant:

> "The 'major life activity' that my disability prevents me from performing is eating, or more accurately, metabolizing what I eat.
>
> I have a disabling condition resulting from being an insulin-depending diabetic in that I am not able to normally eat and metabolize food and stay with acceptable ranges of blood sugar levels without the assistance of insulin injections and other medication designed to lower blood sugar levels. The medication I take further necessitates that I limit strenuous activities, physical exhaustion and exposure to heat in order to minimize the potential for hypoglycemic shock, a condition brought on when blood sugar levels go too low.
>
> This disease affects the chemistry of the body in such a way that the sugar levels in the blood stream are not naturally controlled as they would be for someone without this disease. Sugar from the blood stream is what provides the fuel for the body but if an individual's blood sugar goes either too high or too low it is [a] very serious (even life threatening) condition. When this level is too high there is cell damage in the tissues of the body that leads to serious long-term complications

8

such as kidney damage and blindness.  When this sugar level goes too low it produces a condition called hypoglycemia resulting in dizziness, disorientation and even unconsciousness."

(SOF ¶ 25.)

The duration of Plaintiff's condition and the permanent or long term impact resulting from Plaintiff's condition is perhaps best characterized by Dr. Woehl's direction to Merkel imposing several "permanent accommodations" to be made for Plaintiff.

Accordingly, Plaintiff is disabled as that term is defined under the ADA – he has a physical or mental impairment that substantially limits one or more of his major life activities – and Defendant's Motion that it is entitled to summary judgment should be denied.

### B.    Plaintiff Is a "Qualified" Individual Under the ADA

The ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111 (8). When an employee is seeking reassignment of his position as an accommodation, he is a "qualified individual" if he can "perform the essential functions of [the] reassignment position, with or without reasonable accommodation, even if [he] cannot perform the essential functions of the current position. *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1111 (9th Cir. 2000).

Moreover, "an employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description." *Cripe v. City of San Jose,* 261 F.3d 877, 887 (9th Cir. 2001) (citation omitted). A job's "essential functions" are "the fundamental job duties of the employment position. . . . The

term 'essential functions' does not include the marginal functions of the position." 29 C.F.R. § 1630.2 (n)(1).

Plaintiff's job duties are delineated in the job description report last evaluated by Defendant on June 25, 1990, the same year that Plaintiff began working for Merkel in the Plant Technical Support Group. (SOF ¶ 3.) Under the heading "Primary Statement of Duties", the job description for welding metallurgy specialist identified twelve specific duties. Defendant has made no allegation in its Motion that Plaintiff was not performing any of these duties. Nor does Defendant challenge any aspect of Plaintiff's performance under other headings in the job description, including "Job Knowledge", "Level of Decision Making", Judgment/Problem Solving", "Responsibility for Planning", "Level of Analysis", "Written Communications", "Responsibility for Relations", "Supervision Received", "Working Conditions", "Job Structure and Complexity", and "Impact on the Organization." Rather, Defendant offers as the sole basis for its argument that Plaintiff was not qualified for his position the observation that Plaintiff was not able to recertify for the respirator. Defendant's argument is fatally flawed for at least four reasons.

First, the job description for welding metallurgy specialist identified twelve specific duties. These duties are clearly defined under the heading "Primary Statement of Duties." These duties arguably make up the "the fundamental job duties of the employment position…" 29 C.F.R. § 1630.2 (n)(1). The alleged "requirement" that Plaintiff secure respirator medical certification is identified not in the list of Primary Statement of Duties, but rather as the final item under the final heading entitled "Knowledges, Skills, Abilities and Other Job Characteristics." Defendant acknowledges in its own Statement of Facts that "[a]lthough

Plaintiff had not had to use a respirator while an employee of SRP (a period of 24 years), there is always the possibility that during his work as a welding metallurgy specialist the conditions requiring the use of a respirator might arise unexpectedly." (*See* Defendant's Statement of Facts ["DSOF"], at ¶ 36.) A "requirement", as Defendant contends such certification is, that has not arisen in 24 years of employment can hardly be called an essential function of the job. The ADA contemplated just such a contrived interpretation of job duties by declaring that "[t]he term 'essential functions' does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1).

Second, the "requirement" for respirator certification is not found on the functional assessment for the welding metallurgy specialist position first created in 1992. (SOF ¶ 4.) No mention is made under the heading "Position Activities (Essential Functions)", or under any other heading therein. Moreover, Defendant did not identify any such requirement in the modified functional assessment it prepared on February 1, 2004, in which it condensed the twelve primary duties found on the Job Description Report into six functional areas. (SOF ¶ 11.)

Third, Defendant did not terminate Plaintiff for failure to become recertified on the respirator. Rather, Defendant indicated to Plaintiff in a meeting on March 16, 2004, that "based upon his permanent medical restrictions, he could no longer perform the essential functions of his job", which reason Defendant later memorialized in its position letter to the EEOC in response to Plaintiff's Charge of Discrimination. (SOF ¶ 22.) Moreover, Merkel testified that only two of the six accommodations listed by Dr. Woehl – working under thermal stress and working from unprotected heights/no unprotected climbing – prevented Plaintiff from

11

performing his essential job functions. (SOF ¶ 18.) However, these two accommodations are not essential functions of the job but rather are environmental working conditions. (SOF ¶ 19.)

Fourth, Defendant's designated medical provider, Dr. Woehl, responded to Merkel's request for a reassessment of Plaintiff's condition by stating that "[i]t remains my opinion that Mr. Rohr is physically able to perform the essential functions of his job **with** the accommodations as outlined." (SOF ¶ 16, emphasis added.) Defendant has offered no explanation for its contradictory position that Plaintiff could not perform the essential functions of his job in the face of the more medically reliable finding by its own physician that Plaintiff could. (SOF ¶ 17.)

In conclusion, Defendant's proffered argument that Plaintiff was not a qualified individual with a disability because he failed to obtain respirator recertification is unavailing. Assuming, *arguendo*, that recertification was a job requirement, it was not an essential function of Plaintiff's job. Accordingly, Defendant's Motion for summary judgment as a matter of law should be denied.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's Motion for Summary Judgment on Plaintiff's disability discrimination claim under the ADA. Plaintiff respectfully withdraws his claim of age discrimination under the Age Discrimination in Employment Act and his claim for punitive damages.

RESPECTFULLY SUBMITTED this  16th  day of May, 2006.

LAW OFFICE OF ROBERT M. GREGORY, P.C.

By:  s/Robert M. Gregory
Robert M. Gregory
*Attorney for Plaintiffs*

ORIGINAL of the foregoing filed this
 16th  day of May, 2006, with:

Clerk of the Court
U.S. District Court
401 W. Washington Street
Phoenix, AZ

s/Robert Gregory